02-08-226-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT
 OF APPEALS
 SECOND
 DISTRICT OF TEXAS
 FORT
 WORTH
  
 
 


 

NO. 02-08-00226-CV

 

 


 
 
 Linda Faust and
 Donnie Faust
 
 
  
 
 
 APPELLANTS
 
 
 
 
  
 V.
  
 
 
 
 
 BNSF Railway
 Company
 
 
  
 
 
 APPELLEE
 
 


 

 

------------

 

FROM THE 96th District Court OF Tarrant COUNTY

------------

OPINION

 

------------

 

I.  Introduction

          Appellants Linda Faust and Donnie Faust sued Appellee
BNSF Railway Company (BNSF) for personal injuries and damages that they allegedly
sustained from exposure to chemicals released by BNSF’s wood treatment facility
in Somerville, Texas.  After a lengthy trial, a jury rendered a verdict in
favor of BNSF, concluding that BNSF’s negligence, if any, did not proximately
cause Linda’s stomach cancer.  In two issues, the Fausts argue that the trial
court committed reversible error by overruling their objection to a specific
causation instruction and that the evidence is factually insufficient to
support the jury’s “No” answer to question number 1.  We will affirm.

II.  Factual and Procedural Background

          The Fausts live in Somerville.  Linda moved
there and married Donnie in 1980.  Donnie has lived in Somerville most of his
life.  The Fausts’ home is located approximately 4,000 feet from the Somerville
Tie Plant.

          Donnie began working at the plant in 1974. 
He performed a number of different duties, including working as a “roustabout,”
driving a trash truck, and operating various machinery.  Donnie came into
contact with creosote when he worked at the plant and often had creosote on him
when he came home from the plant.

          Linda worked a number of different jobs that
were located near the plant, shopped near the plant, and, many times, visited
Donnie at the plant during his lunch break.  She smoked between one-half and
one full pack of cigarettes every day for twenty-five years; began experiencing
headaches, nausea, and stomach pain in the early 1980s; and had a twelve-year medical
history of stomach problems.  In 1998, Linda was diagnosed with diffuse signet
cell stomach cancer and Helicobacter pylori infection (H. pylori).  She
subsequently underwent a radical complete gastrectomy, in which her entire
stomach was removed.[1]

          BNSF’s predecessor, the Atchison, Topeka
& Santa Fe Railway (AT&SF), began operating the plant in 1905.[2] 
The plant, which occupied a 200-acre tract of land in Burleson County and
operated twenty-four hours a day, treated railroad ties and other wood products
with chemicals to preserve the wood and increase the products’ service life.  A
mixture of creosote[3] and extender oil (predominantly
30% creosote and 70% oil) was the primary chemical applied to the ties in one
of four treating cylinders measuring 8 feet in diameter by 155 feet in length.[4]
 Each treating process (commonly referred to by plant employees as a “charge”)
lasted between eight and twenty-four hours, depending on whether the ties had
been air dried or needed to be vapor dried in the treating cylinder using a
drying agent.[5]

          The plant generated several types of waste:

·       
drainage from a treating cylinder consisting of creosote mixture
and possibly wood fragments that accumulated in a “pit” located in front of the
cylinder door when the door was opened after the completion of a charge;

 

·       
“kickback” (also known as “drippage”), which consisted of residual
creosote mixture that dripped off of treated ties that were removed from a
cylinder and onto rock ballast or “screening” that was laid directly underneath
the tracks on which the “trams” that carried the ties rolled;[6]

 

·       
before the plant began using chains, treated wood slats (spacers)
that were placed in between the ties during the treatment process;

 

·       
sawdust used to absorb chemicals and to clean the cylinders and
pits;

 

·       
boiler emissions, which may have included dioxins[7]
and polycyclic aromatic hydrocarbons (PAHs),[8] from burning treated wood
in a boiler[9]

 

·       
wastewater (also called “sap water”) resulting from the process
of vapor-drying wood products; and

 

·       
emissions released into the
atmosphere from several different sources.

The amount of waste that the
plant generated and the means by which the plant disposed of it or used it was
hotly contested at trial.

          The Fausts alleged that BNSF negligently
allowed the release of toxic and hazardous chemicals, solvents, and substances
into the soil, groundwater, water, and air in and around the plant; that they
have been and continue to be exposed to the toxic chemicals released from the
plant; and that their bodies, real property, and home have been contaminated by
the chemicals, proximately causing them injuries and damages, including, but
not limited to, cancer.  At trial, each side offered expert testimony relevant
to, among other things, the disputed fact issues of negligence and causation. 
As part of its charge, the trial court submitted the following instruction to
the jury:  “In order to prove specific causation for exposure from the
Somerville Tie Plant, the Plaintiffs must exclude, with reasonable certainty,
other plausible causes of Linda Faust’s stomach cancer, such as her history of
smoking cigarettes and her Helicobacter pylori infection.”[10]
 Jury question number 1 asked whether “the negligence, if any, of [BNSF
was] a proximate cause of Linda Faust’s stomach cancer.”  The jury answered, “No,” and, as instructed, did not proceed to answer any
of the remaining questions.  In accordance with the jury’s verdict, the trial
court entered a take-nothing judgment on the Fausts’ claims against BNSF, and
it denied the Fausts’ motion for new trial.  The Fausts filed their notice of this
appeal.

III.  Specific Causation Instruction

          In their first issue, the Fausts argue that
the trial court committed reversible error by overruling their objection to the
specific causation instruction.  They contend that the instruction was
erroneous because it (1) improperly heightened their burden of proof, (2) improperly
shifted the trial court’s gatekeeper function to the jury, and (3) constituted
an impermissible comment on the weight of the evidence.  They further argue
that the inclusion of the instruction was harmful because the jury expressed
some confusion about it and rendered its verdict shortly after the trial court
addressed a jury note inquiring in part about the instruction.  BNSF responds
that the Fausts failed to preserve part of their first issue for appellate
review, that the trial court did not abuse its discretion by including the instruction
in the charge, and that, even if erroneous, the trial court’s inclusion of the
instruction was harmless.

          A.      Preservation of Error

          An objection to the jury charge must timely and plainly make the trial
court aware of the complaint, and the complaining party must obtain a ruling.  Ford
Motor Co. v. Ledesma, 242 S.W.3d 32, 43–44 (Tex. 2007); State
Dep’t of Highways & Pub. Transp. v. Payne, 838 S.W.2d 235, 241 (Tex.
1992) (op. on reh’g); see Tex. R. App. P. 33.1(a); Tex. R. Civ. P. 274
(requiring a party objecting to a charge to point out distinctly the
objectionable matter and the grounds of the objection).  If a party fails to do
this, error is not preserved, and the complaint is waived.  Payne, 838
S.W.2d at 241.

          The
Fausts asserted the following objection to the specific causation instruction
at the charge conference:

          Mr.
Woodfill:  With respect to the instruction, Your Honor, the other objection we
had was to paragraph 2, information regarding Linda Faust’s cigarette smoking
and the Helicobacter -- H. pylori bacteria infection.  We believe that
this is an improper role of the Court’s gatekeeper function and should not be
included in the instruction.  And we believe it’s unfairly prejudicial to
the client.  It can be argued in the proximate cause section that’s addressed
in Question Number 1, I believe.  Additionally, Your Honor, we don’t believe
that there was any evidence -- Well, that’s enough.  [Emphasis added.]

 

The Fausts’
objection did not timely and plainly make the trial court aware that they were
objecting on the grounds that the instruction improperly
heightened their burden of proof and constituted an impermissible comment on
the weight of the evidence, nor were these arguments apparent from the context
of the objection.  See, e.g., Fethkenher v. Kroger Co., 139 S.W.3d 24,
31–32 (Tex. App.—Fort Worth 2004, no pet.) (holding that appellant’s objection
did not make trial court aware of complaint that instruction was an
impermissible comment on weight of the evidence).  We cannot agree with the
Fausts’ contentions that an objection to the shifting of the gatekeeper
function from the trial court to the jury “is necessarily” an objection to the
trial court adding elements to the Fausts’ burden of proof that do not exist
under the law and “is necessarily” an objection that the trial court is
commenting on the weight of the evidence.  This argument conflicts with the dictates
of rule of appellate procedure 33.1(a) and Payne.

          Citing Payne, the Fausts argue
that their objection at the charge conference was sufficient to preserve this
issue with regard to any of the legal bases for the objection because they
submitted a proposed jury charge in writing that did not include the specific
causation instruction.  Payne did not hold that submitting a jury charge
in writing that omitted a later complained-of instruction was sufficient to
preserve error as to the inclusion of the instruction on any legal basis. 
Rather, Payne held that “[t]here should be but one test for determining
if a party has preserved error in the jury charge, and that is whether the
party made the trial court aware of the complaint, timely and plainly, and
obtained a ruling.”  Payne, 838 S.W.2d at 241.  Consistent with its
holding, the supreme court reasoned in part that the State had preserved its charge
error issue for appellate review because it had requested that the trial court question
the jury about Payne’s knowledge of the culvert, and the trial court’s refusal
to do so “constituted a clear refusal to submit a premise defect theory to the
jury.”  Id. at 239.  Thus, the trial court could not have clearly
refused to submit the premise defect question if it was not aware that the
State had requested that the question be submitted.

          Here,
unlike in Payne, the Fausts are not complaining on appeal about the
trial court’s refusal to include in the charge a specifically requested question. 
Instead, they are complaining about the inclusion of an instruction that was
not part of the proposed jury charge that they submitted to the trial court. 
The difference is significant because in Payne, the State timely made
the trial court aware that it specifically desired the inclusion of the
question in the charge.  Id.  In this case, there is nothing in the
record to indicate that the Fausts timely made the trial court aware that they
were objecting to the instruction on the grounds that it heightened their
burden of proof and amounted to a comment on the weight of the evidence,
including by merely omitting the specific causation instruction from their
proposed jury charge.  Therefore, other than identifying the proper standard
for preserving charge error, Payne is factually distinguishable from
this case and, consequently, inapposite.

          Accordingly,
we hold that of the three arguments the Fausts assert on appeal, the objection
lodged at the charge conference was sufficient to preserve for appellate review
only their second argument—that the instruction improperly shifted the trial
court’s gatekeeper function to the jury.  See Ledesma, 242 S.W.3d at 43–44; Payne,
838 S.W.2d at 241; see also Tex. R. App. P. 33.1(a).

          B.      No Abuse of
Discretion

 

          The
Fausts argue that “[t]o the extent the cases require a scientific expert to
exclude other plausible causes ‘with reasonable certainty,’ that requirement relates
solely to the trial court’s determination under Rule 702 on whether the
testimony is reliable and admissible.”  [Emphasis added.]  They thus maintain that
the instruction “clearly incorporated elements for the court, not the jury, to
consider when making a determination as to the admissibility of the offered
testimony” and, therefore, that the instruction “improperly place[d] in the
hands of the jury the trial court’s gatekeeper function.”  BNSF responds that
the instruction correctly stated the law, had evidentiary support, and assisted
the jury in resolving contested fact issues.

          A
trial court must submit “such instructions and definitions as shall be proper
to enable the jury to render a verdict.”  Tex. R. Civ. P. 277; Union Pac.
R.R. Co. v. Williams, 85 S.W.3d 162, 166 (Tex. 2002).  An instruction is
proper if it (1) assists the jury, (2) accurately states the law, and
(3) finds support in the pleadings and evidence.  Columbia Rio Grande
Healthcare, L.P. v. Hawley, 284 S.W.3d 851, 855 (Tex. 2009).  Rule 277 affords
the trial court considerable discretion in deciding what instructions are
necessary and proper.  Tex. R. Civ. P. 277; State Farm Lloyds v. Nicolau,
951 S.W.2d 444, 451–52 (Tex. 1997).  In fact, a trial court is afforded
even more discretion when submitting instructions than when submitting
questions.  GuideOne Lloyds Ins. Co. v. First Baptist Church of Bedford,
268 S.W.3d 822, 836–37 (Tex. App.—Fort Worth 2008, no pet.).  Thus, determining
necessary and proper jury instructions is a matter within the trial court’s
discretion, and appellate review is for abuse of that discretion.  Shupe v.
Lingafelter, 192 S.W.3d 577, 579 (Tex. 2006).  A trial court abuses its
discretion if it acts in an arbitrary or unreasonable manner or without
reference to any guiding rules or principles.  Downer v. Aquamarine
Operators, Inc., 701 S.W.2d 238, 241–42 (Tex. 1985), cert. denied, 476 U.S. 1159
(1986).

          The Fausts’ argument disregards the
distinction between the trial court’s responsibility to determine whether
proffered scientific evidence is based on a reliable foundation and, therefore,
admissible and a proponent’s burden to prove causation in a toxic tort case in
which an expert relies on epidemiological studies to support his opinion that
the plaintiff’s exposure to a particular substance caused the plaintiff’s
complained-of injury.[11]

          Rule 702 requires the proponent of
expert testimony to show not only that the expert is qualified, but also that
the expert’s testimony is relevant to the issues in the case and is based on a reliable
foundation.  E.I. du Pont de Nemours and Co. v. Robinson, 923 S.W.2d
549, 556 (Tex. 1995).  When a party objects to the reliability of its
opponent’s scientific expert testimony, the trial court—in exercising its
gatekeeper function—is responsible for making the preliminary determination of
whether the proffered testimony meets the standards of scientific reliability. 
Id. at 556–57; see Helena Chem. Co. v. Wilkins, 47 S.W.3d
486, 499 (Tex. 2001); see also Exxon Pipeline Co. v. Zwahr, 88
S.W.3d 623, 629 (Tex. 2002).  If the trial court sustains an objection to
expert testimony, the proponent of the evidence may complain on appeal that the
trial court abused its discretion by excluding the evidence.  See Ledesma,
242 S.W.3d at 39; Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d
713, 718–19 (Tex. 1998).  If, on the other hand, the trial court overrules an
objection to expert testimony, the opponent of the evidence may complain on
appeal that the evidence is legally insufficient to support the jury’s
causation finding because the scientific evidence is unreliable and, thus, no
evidence.[12]  See Havner,
953 S.W.2d at 714; Austin v. Kerr-McGee Refining Corp., 25 S.W.3d 280,
285 (Tex. App.—Texarkana 2000, no pet.).  A party must object to the evidence
before trial or when the evidence is offered to preserve a complaint on appeal
that scientific evidence is unreliable.  Mar. Overseas Corp. v. Ellis,
971 S.W.2d 402, 409–11 (Tex. 1998).  But see Coastal Transp. Co. v. Crown
Cent. Petroleum Corp., 136 S.W.3d 227, 232 (Tex. 2004) (reasoning that an
objection is not needed to preserve a no-evidence challenge to conclusory testimony).

          Distinct
from the trial court’s rule 702 reliability determination is a complainant’s
burden to prove causation, a fact question, in a toxic tort case.  In addition
to explaining that an appellate court must go beyond
an expert’s bare conclusions when performing a legal sufficiency review
and determine whether the expert’s opinion is scientifically reliable, the
supreme court in Havner identified the evidentiary standard that a
plaintiff must satisfy to prove causation in a toxic tort case:  general and
specific causation.  Havner, 953 S.W.2d at 714.  General
causation asks whether a substance is capable of causing a particular injury in
the general population, and specific causation asks whether that substance
caused a particular individual’s injury.  Id.; Georgia-Pacific Corp.
v. Stephens, 239 S.W.3d 304, 308 (Tex. App.—Houston [1st Dist.] 2007, pet.
denied).  The cases—both state and federal—are legion that a plaintiff in a
toxic tort case must prove general and specific causation.  See, e.g., Golden
v. CH2M Hill Hanford Group, Inc., 528 F.3d 681, 683 (9th Cir. 2008);
Knight v. Kirby Inland Marine Inc., 482 F.3d 347, 351 (5th Cir.
2007); Amorgianos v. Nat’l R.R. Passenger Corp., 303 F.3d 256, 268 (2d
Cir. 2002); King v. Burlington N. Santa Fe Ry. Co., 762 N.W.2d 24, 34
(Neb. 2009); Parker v. Mobil Oil Corp., 857 N.E.2d 1114, 1120–21 (N.Y.
2006); Mobil Oil Corp. v. Bailey, 187 S.W.3d 265, 270 (Tex. App.—Beaumont
2006, pet. denied); Brookshire Bros., Inc. v. Smith, 176 S.W.3d 30, 36–37
(Tex. App.—Houston [1st Dist.] 2004, pet. denied) (op. on reh’g).

          “By
far the most difficult problem for plaintiffs to overcome in toxic tort
litigation is the burden of proving causation.”  James v. Bessemer
Processing Co., Inc., 714 A.2d 898, 909 (N.J. 1998) (citing Ayers v.
Jackson Twp., 525 A.2d 287, 301 (N.J. 1987)).  This is because, in some
cases, “controlled scientific experiments can be carried out to determine if a
substance is capable of causing a particular injury or condition, and there
will be objective criteria by which it can be determined with reasonable
certainty that a particular individual’s injury was caused by exposure to a
given substance.”  Havner, 953 S.W.2d at 714–15.  “However, in many toxic tort cases, direct experimentation
cannot be done, and there will be no reliable evidence of specific causation.” 
Id. at 715.  Therefore, to prove causation, the plaintiff may attempt to
demonstrate through circumstantial evidence that exposure to the substance at
issue increases the risk of the plaintiff’s particular injury.  See id. 
As in this case, this may be achieved through testimony in which an expert
relies on epidemiological studies to support his opinion that the plaintiff’s
exposure to a particular substance caused the plaintiff’s complained-of injury. 
Id.  Epidemiological studies examine existing populations to attempt to
determine if there is an association between a disease or condition and a
factor suspected of causing that disease or condition.  Id.

          But
“[e]vidence that a chemical can cause a disease is no evidence that it probably
caused the plaintiff’s disease.”  In re Allied Chem. Corp., 227 S.W.3d
652, 656 (Tex. 2007) (orig. proceeding); see Merck & Co., Inc. v.
Ernst, 296 S.W.3d 81, 96 (Tex. App.—Houston [14th Dist.] 2009, pet. filed)
(“Proving one type of causation does not necessarily prove the other, and both
are needed for a plaintiff in a toxic-tort suit to prevail”).  Therefore, “[t]o
raise a fact issue on causation . . . , a claimant must do
more than simply introduce into evidence epidemiological studies that show a
substantially elevated risk.”  Havner, 953 S.W.2d at 720 (emphasis
added).  To prove specific causation, the complainant must show that he is
similar to those in the studies.  Id.  This burden to show similarity
includes “proof” that the injured person was exposed to the same substance,
that the exposure or dose levels were comparable to or greater than those in
the studies, that the exposure occurred before the onset of injury, and that
the timing of the onset was consistent with that experienced by those in the
study.  Id.; Matt Dietz Co. v. Torres, 198 S.W.3d 798, 804 (Tex.
App.—San Antonio 2006, pet denied).  The burden of proof also requires that “if
there are other plausible causes of the injury or condition that could be
negated, the plaintiff must offer evidence excluding those causes with
reasonable certainty.”  Havner, 953 S.W.2d at 720 (emphasis added).

          Although
the issue here concerns the “other plausible causes” aspect of the specific
causation inquiry, the supreme court recently addressed a different part of the
inquiry—dose—in the context of an asbestos exposure case.  In Borg-Warner
Corp. v. Flores, the supreme court held that to prove specific causation in
an asbestos exposure case, there must be some evidence of an aggregate
dose of exposure to the plaintiff that was a substantial factor in causing the
asbestos-related disease.  232 S.W.3d 765, 769–70 (Tex. 2007).  In explaining
the significance of dose, the supreme court cited Havner and reiterated that
“[w]e have held that epidemiological studies are without evidentiary
significance if the injured person cannot show that ‘the exposure or dose
levels were comparable to or greater than those in the studies.’”  Id.
at 771 (emphasis added).  Borg-Warner did not involve an inquiry into
the reliability of an expert’s testimony, i.e., the exercise of the trial
court’s gatekeeper function; rather, it considered the legal sufficiency of the
specific causation evidence as a quantitative measure.

          Case
law reveals that instructing the jury about the appropriate causation standard
is sometimes required, as it was here.  See Hawley, 284 S.W.3d at 859–62. 
In Hawley, a health care liability case against a hospital involving
lost chance of survival, the trial court refused to give the jury an instruction
that a patient’s recovery is barred if a condition preexists the negligence of
the health care provider and at the time of the negligence, the condition
resulted in the patient having a 50% or less chance of cure or survival.  Id.
at 855, 859–60.  The hospital argued on appeal that the trial court erred by
not instructing the jury that the plaintiff “must have had a greater than fifty
percent (50%) chance of survival” for the hospital’s alleged negligence to be
the proximate cause of the plaintiff’s death.  Id. at 859.  The supreme
court agreed, reasoning that “[t]he instruction would have provided to the jury
the standard it was required by law to apply in making its finding on a
hotly-contested issue.”  Id. at 862.  This was necessary because,

[a]s this Court
stated over a century ago when considering alleged charge error, “[w]e must
look at the court’s charge as practical experience teaches that a jury,
untrained in the law, would view it.”  It asks too much of lay jurors,
untrained in the law, to distill the correct Texas legal standard for loss of
chance from the general proximate cause instruction given by the trial court. 
Columbia’s requested loss of chance instruction would have assisted the jury,
was an accurate statement of applicable law, and was supported by the pleadings
and evidence.  The trial court abused its discretion by refusing to give it.

 

Id. 
(citations omitted).

          Here,
the record demonstrates that there was evidence
of other plausible causes of Linda’s gastric cancer:  H. pylori
and cigarette smoking.  Peter Shields, M.D., testified for BNSF that
H. pylori is an established cause of stomach cancer and that, by itself,
it was a substantial cause of Linda’s stomach cancer.  He also testified that
there is a “pretty broad consensus” that smoking can cause stomach cancer and
that he could not imagine what evidence someone could review in this case to
conclude that smoking was not the cause or a substantial contributor to Linda’s
stomach cancer.

          The Fausts elicited testimony in an effort
to exclude cigarette smoking and H. pylori as causes of Linda’s stomach
cancer.  James Dahlgren, M.D. opined that Linda’s stomach cancer was caused by
dioxins and PAHs from the plant, and he testified that he was able to exclude
both H. pylori and smoking as causes of Linda’s stomach cancer.[13] 
The Fausts thoroughly cross-examined Dr. Shields about his causation opinions.

          Accordingly, although we agree with
the Fausts that it is the role of only the trial court to determine whether an
expert’s testimony is reliable, we disagree with their argument that the burden
to exclude other plausible causes of injury relates solely to the trial court’s
rule 702 reliability inquiry.[14]  The Fausts had the
burden to prove causation—both general and specific—in this chemical exposure
case, and they attempted to meet that burden primarily through the testimony of
an expert witness who relied on epidemiological studies.  There was evidence of other plausible causes of Linda’s
gastric cancer, and the Fausts made an effort to exclude those causes through
Dr. Dahlgren’s testimony.  The complained-of instruction is an accurate,
albeit arguably incomplete, statement of the law, identifying what Linda must
show to raise a fact issue as to causation.[15]  See Havner, 953
S.W.2d at 714–15, 720.  And instructing
the jury that other plausible causes of Linda’s gastric cancer must be excluded
with reasonable certainty assisted the jury by providing it with “the standard
it was required by law to apply in making its finding on a hotly-contested
issue”—causation.[16]  See Hawley, 284
S.W.3d at 855, 862; Havner, 953 S.W.2d at 720.  We hold that the trial court did not abuse its
discretion by including the specific causation instruction in the jury charge.

          C.      Harm

          Even
if the instruction was improper, we cannot conclude that it was harmful.  A
judgment will not be reversed for charge error unless the error was harmful
because it probably caused the rendition of an improper verdict or probably
prevented the petitioner from properly presenting the case to the appellate
courts.  Tex. R. App. P. 44.1.  We review the entire record to determine
whether the submission or refusal to submit an instruction probably resulted in
an improper judgment.  Timberwalk Apartments, Partners, Inc. v. Cain,
972 S.W.2d 749, 756 (Tex. 1998).

          The Fausts argue that the instruction was
harmful because the jury expressed some confusion about it in a note and
rendered its verdict shortly after the trial court responded to the note
inquiring about the instruction.  The note stated,

The instructions indicate that “In
order to prove specific causation for exposure from Somerville Tie Plant, the
Plaintiffs must exclude, with reasonable certainty, other plausible causes of
Linda Faust’s stomach cancer, such as her history of smoking cigarettes and her
H. Pylori infection.”

 

On question 2 it gives us the ability to give a % to
both Linda & the railroad.  The question is if we say the smoking/infection
are not causes, how can we give a % to Linda?  Or vice versa if we say the
smoking/infection were partial causes how can we give the RR a %?

The instructions seem to contradict Question 2.

The trial court
responded, 

          Your
observation that a contradiction exists is well-taken.

          You are, therefore,
instructed that you are not to answer Question 1b as to Linda Faust, nor are
you to answer Question 2.

 

          The
instruction given you in paragraph 3 on page 3 still applies.

 

But it is just as reasonable to conclude that the
trial court ameliorated the jury’s confusion when it withdrew Linda’s name from
jury question number 1 and withdrew jury question number 2 (the proportionate
responsibility question) in its entirety.  This consequently limited the jury
to making a finding in regard to only BNSF’s negligence, if any, that
proximately caused Linda’s stomach cancer.

          Also,
by the time the trial court charged the jury, it had already exercised its
gatekeeper function and permitted the Fausts’ designated causation expert, Dr.
Dahlgren; negligence expert, Nicholas
Cheremisinoff, Ph.D.; and dose expert, Paul Rosenfeld, Ph.D.; to testify
at trial.  Before trial, BNSF had moved to strike each of the experts’ testimony
on the grounds that the testimony was irrelevant and scientifically unreliable,
but the trial court exercised its gatekeeper function and permitted the Fausts
to elicit expert testimony from each of them.  There is nothing in the record
demonstrating that the jury played any role in determining the admissibility of
Dr. Dahlgren’s, Dr. Cheremisinoff’s, Dr. Rosenfeld’s, or any other expert’s
testimony before they presented their opinions in evidence.

          Further,
the charge is crystal clear regarding exactly what the jury was to do and not
to do in performing its ultimate duty as factfinder.  For example, the charge
informed the jury that it was “the sole judge[] of the credibility of the
witnesses and the weight to be given their testimony”; that it was to “consider
only the evidence introduced here under oath”; and, among other things, that it
was to “not consider or discuss anything that is not represented by the
evidence in this case.”  No part of the charge specifically or inferentially instructed
or otherwise informed the jury that it was not to assess the weight and
credibility of the Fausts’ experts’ testimony in the event it concluded that the
testimony was irrelevant or scientifically unreliable.  The jury is presumed to
have followed the trial court’s instructions.  See Hawley, 284 S.W.3d at
862 (citing Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 771
(Tex. 2003)).  Accordingly, it is mere speculation to conclude that the jury—contrary
to both the entire charge and the presumption that the jury followed the trial
court’s instructions—somehow read the complained-of instruction as adding an
additional component to the jury’s responsibility to determine the weight and
credibility of the experts’ testimony that is akin to the trial court’s
gatekeeper function of allowing or disallowing an expert to offer opinion
testimony.

          Moreover,
both the Fausts’ and BNSF’s causation experts relied on epidemiological studies
to support their opinions.  To be considered reliable scientific evidence of
general causation, an epidemiological study must (1) have a relative risk
of 2.0[17] and (2) be
statistically significant at the 95% confidence level.[18] 
Havner, 953 S.W.2d at 717–18, 723–24.  To the extent the Robinson
factors, the Bradford Hill criteria, or both are relevant to the court’s
gatekeeper function,[19] they each have their own
detailed requirements.[20]  Consequently, in the
absence of additional, detailed instructions, the specific causation instruction
did not fully arm the jury with the tools that it needed to even exercise a
gatekeeper function.  See Exxon Corp. v. Makofski, 116 S.W.3d 176, 180
(Tex. App.—Houston [14th Dist.] 2003, pet. denied) (“Undoubtedly, the tools
used to test the reliability of expert testimony will vary depending on the
field of expertise involved.  But it is impossible to ignore the Havner
factors here, as the field of expertise is the same—the epidemiological
evidence connecting a chemical exposure and a disease.”); Austin, 25 S.W.3d
at 287 (“[A] trial court could not properly review the reliability of
scientific testimony based on epidemiological studies if it were required to
ignore the basic principles articulated in Havner that the scientific
community employs in conducting such studies.”).

          Finally,
as BNSF points out, the entire record
demonstrates that the jury could have reasonably concluded that the Fausts
failed to carry their burden of proof that BNSF was negligent or that BNSF’s
negligence proximately caused Linda’s stomach cancer, notwithstanding the
instruction.

          For all of these reasons, we hold that even
if the trial court abused its discretion by overruling the Fausts’ preserved objection
to the specific causation instruction, the error was not harmful.  See
Tex. R. App. P. 44.1.  We overrule the Fausts’ first issue.

IV.  Evidentiary Sufficiency

          In
their second issue, the Fausts argue that the evidence is factually
insufficient to support the jury’s finding that BNSF’s negligence, if any, was
not the proximate cause of Linda’s stomach cancer.  In light of the broad-form
submission, the jury’s “No” answer to question number 1 could have been based
upon the jury’s refusal to find either that BNSF was negligent or that any such
negligence was a proximate cause of Linda’s stomach cancer.  See Hutchison
v. Pharris, 158 S.W.3d 554, 562 (Tex. App.—Fort Worth 2005, no pet.)
(stating that appellate court need not address evidentiary sufficiency to
support negligence finding of broad-form submission if court held that evidence
supported proximate cause finding); Carr v. Jaffe Aircraft Corp., 884
S.W.2d 797, 802–03 (Tex. App.—San Antonio 1994, no pet.).  Therefore, to
sustain this issue, the evidence must be factually insufficient to support the
jury’s refusal to find both that BNSF was negligent and that any such
negligence was a proximate cause of Linda’s stomach cancer.

          A.      Standard
of Review

            When reviewing an assertion that the evidence is
factually insufficient to support a finding, we set aside the finding only if,
after considering and weighing all of the evidence in the record pertinent to
that finding, we determine that the evidence supporting the finding is so weak,
or so contrary to the overwhelming weight of all the evidence, that the answer
should be set aside and a new trial ordered.  Pool v. Ford Motor Co.,
715 S.W.2d 629, 635 (Tex. 1986) (op. on reh’g); Garza v. Alviar, 395
S.W.2d 821, 823 (Tex. 1965); In re King’s Estate, 150 Tex. 662, 244
S.W.2d 660, 661 (1951).  When the party with the burden of proof appeals from a
failure to find, as in this case, the party must show that the failure to find
is against the great weight and preponderance of the evidence.  Cropper v.
Caterpillar Tractor Co., 754 S.W.2d 646, 651 (Tex. 1988); see Herbert v.
Herbert, 754 S.W.2d 141, 144 (Tex. 1988).

B.      Factually Sufficient Evidence to Support
Jury’s “No” Answer—Negligence[21]

 

Much of
the evidence that the Fausts presented in regard to whether BNSF was negligent
came from the testimony of Dr. Cheremisinoff,
who performed a “responsible care analysis” of the plant for the Fausts.  Dr.
Cheremisinoff described his task and the methodology that he used to perform
the analysis as follows:

          [Dr. Cheremisinoff]: 
Okay.  What I do is I look at the operations.  Since I’m a chemical engineer,
I’m able to dissect the manufacturing process.  So I looked at the
manufacturing process to make treated wood ties, and I determined the amount of
waste that was generated and the types of waste.  So after quantifying those
wastes, I then examined what practices were used by the railroad to manage
those wastes; and I compared those practices to the available standards of the
day and the technologies of the day to manage those wastes; and I -- I rendered
an opinion as to whether they did -- they used proper technologies, procedures,
and practices to -- to manage those wastes.

 

          . . . .

 

          [Fausts’
counsel]:  Doctor, when you conduct a responsible care analysis, are you -- and
you’re trying to look at what a company did, are you looking at whether they
acted responsible or were negligent in a particular case or situation?

 

          [Dr.
Cheremisinoff]:  It can be.  In this case, that’s exactly what I focused on.

 

          [Fausts’
counsel]:  When you’re doing a responsible care or negligence analysis, do you
look at how a company manages its hazardous or its toxic waste?

 

          [Dr.
Cheremisinoff]:  Well, yes.  When I talk about responsible care, it’s almost
exclusively with regard to dangerous or hazardous materials.  That’s my area of
expertise.

 

          . . . .

 

          [Fausts’
counsel]:  Okay.  In forming your opinions in this case, Doctor, can you tell
the ladies and gentlemen of the jury about the methodology that you used.

 

          [Dr.
Cheremisinoff]:  Well, yeah.  The methodology is essentially the same.  What I
do is essentially a reconstruction of the practices.  I look at the
manufacturing operation, and I do what is known as a material balance.  I know
what chemicals go into the process and what chemicals go out with the product --
in this case treated wood ties -- and then I determine what portion of the
chemicals entered into different waste streams:  air, water, and solid
waste.  That’s part of the analysis.[22]

 

Dr. Cheremisinoff opined that BNSF negligently
operated the plant because it failed to properly dispose of waste; emitted
harmful toxins into the atmosphere; failed to use a pollution control device on
its boilers; failed to perform any air monitoring of the emissions from the
boilers; failed to inform its employees of the risks associated with exposure
to the chemicals used at the plant; and, among other things, failed to heed
various recommendations, including to provide its employees with protective
clothing and equipment.  In performing the factual sufficiency review, we will address
Dr. Cheremisinoff’s opinions and all of the other evidence pertinent to the
jury’s refusal to find that BNSF was negligent.  See Pool, 715
S.W.2d at 635; Garza, 395 S.W.2d at 823.

                   1.       Disposal of Waste

                             a.       Waste Fed into
Boilers from 1980 to 1994

          Dr.
Cheremisinoff opined that BNSF was negligent because it burned toxic waste in
its boilers, emitting harmful dioxins and PAHs into the atmosphere.  He opined
that BNSF burned a total of 47,875,261 pounds (or 119,688 drums) of toxic cylinder
drainage waste, kickback waste, and treated wood waste in its boilers from 1980
to 1994.[23]

                                      (1)     Cylinder
Drainage

          In arriving at the 47 million pound burned-waste
figure, Dr. Cheremisinoff calculated in part that 3.5 tons of cylinder drainage
emptied from the cylinder every time its door opened and that 30% of that
amount (10% from 1986 to 1994) was ultimately fed into the boiler as fuel.[24]

          Dennis Davis, who began working at the plant
in 1971, agreed with Dr. Cheremisinoff’s figure that 3.5 tons of cylinder
drainage emptied from the cylinder each time the door opened.  Davis testified
that between two and ten barrels of “mulk,” which consisted of creosote
mixture, debris, wainscot, and sand, emptied into the pit when a cylinder door
opened; that employees cleaned up the “mulk” with sawdust and wood chips after
every charge; and that the waste was then taken to the fire room to be burned
at night.

          Donnie Faust testified that he saw the
cylinder doors open only between twenty and thirty times and that approximately
ten to one hundred gallons of cylinder drainage emptied from the cylinder when
the door opened.  Donnie cleaned a pit only once, but he did not see where the
waste was taken.

          A number of witnesses’ testimony conflicted
with Dr. Cheremisinoff’s opinions regarding the amount of cylinder drainage and
the burning of waste in the boilers.  Donald Corwin, a combustion and
incineration consulting engineer who testified for BNSF, disagreed with Dr.
Cheremisinoff’s figures that 3.5 tons of drainage emptied from a cylinder each
time the door opened following a charge, describing the figures as “[w]ay too
high.”  He opined that less than five gallons emptied from the cylinder and
that the material was collected in the sump, reclaimed, and reused.

          Sam Barkley was the plant’s superintendent
from 1971 to 1986.  He testified that a “minute amount” or a “gallon” of
cylinder drainage emptied into the pit when the cylinder door opened and that
the creosote mixture went down a drain to be separated and reused.  Barkley
recalled that the engineers would “pull vacuums” on the product while it was
still in the cylinders in order to recapture as much of the creosote mixture as
possible for separation and reuse.  When the pits were cleaned, which was not
during every shift, a “small” amount of cylinder waste was collected and put in
barrels and landfilled, not burned in the boiler.

          Vernon Welch was the plant’s superintendent
from 1986 to 1994.  He testified in his deposition that 100% of the cylinder
drainage was reclaimed, cleaned, and reused or disposed of off-site in later
years.  If sawdust was used to clean a pit in later years, it was disposed of
in a dumpster.

          Mike Mendoza worked at the plant for
thirty-nine years and testified in his deposition that none of the cylinder
drainage that accumulated in the pits was burned in boilers.  Instead, the
drainage was reclaimed and reused.  Mendoza testified that sawdust was used to
clean the pits and that the sawdust was burned in a boiler, but that the pits
were not cleaned every day.

          Bobby Urbanowsky, who worked at the plant
from 1977 to 1995, testified that, depending on how powerful of a vacuum was
applied to the cylinder before the charge completed, only two to five barrels
of cylinder drainage emptied from a cylinder when its door opened.  Of the two
to five barrels of drainage, the portion that consisted of creosote and liquid
went down a drain to be reclaimed and reused.  When he cleaned up the waste
that remained in the pit (bark, wood products, slush), it filled only “a couple
of barrels,” and he never saw where the barrels were taken.  Urbanowsky opined
that 3.5 tons of cylinder waste could empty from a cylinder only if its door
opened when the cylinder was still full of treating material.  Although he did
not know how often the pit was cleaned, when he was responsible for cleaning
the pit, he did not do so after every charge.[25]

          Mark Stehly, BNSF’s assistant vice-president
of environmental and research and development, testified that he had seen the
cylinder doors open after a charge, that only a “very small amount” of product
emptied out, and that the product went down a drain and was ultimately reused.  Similarly,
David Malter, an industrial hygienist for AT&SF from 1980 to 1987,
testified that only a “few gallons” emptied from the cylinder when its door
opened.  David Shaw, the plant’s current manager, testified that when Koppers
took over the plant, only about two to three gallons of treating mixture
emptied from the cylinder when its door opened after a charge.

          A 1980 “Industrial Hygiene Report” produced
by the National Institute for Occupational Safety and Health (NIOSH) mentioned
nothing about burning cylinder drainage in the boiler.  The report did,
however, state that “[a] vacuum is applied at the end of the treatment cycle to
remove excess creosote solution.”  Dr. Cheremisinoff agreed on
cross-examination that his calculations would be too high if no cylinder
drainage was burned in the boiler.

                                      (2)     Kickback

          Dr. Cheremisinoff opined that from 1980 to 1994, millions
of pounds of kickback from treated wood products contaminated the track area
and ballast located outside the cylinders and that a percentage[26]
of the contaminated ballast was fed into the boiler every day.[27]
 To transport the contaminated ballast to the boiler to be burned, Dr. Cheremisinoff
opined that workers fed the material into a “hog”[28]
and that pneumatic lines moved the material into the boiler.[29]

          Likewise, Davis testified that sawdust was
used to soak up kickback and that the waste was burned in the boiler.  He
described the rock that the kickback settled onto as “little screening,” not
ballast.  Davis opined that between two and eight barrels of kickback waste was
collected and burned each day.

          Donnie Faust testified that before 1992, a
“bunch” of kickback dripped off of the trams and onto the soil.  He said that
you could not help but get it on you because it was “everywhere.”

          Contrary to Dr. Cheremisinoff’s, Davis’s,
and Donnie’s testimony, Corwin testified that Dr. Cheremisinoff’s kickback
figures were off by a factor of a thousand.  For example, Dr. Cheremisinoff
calculated that the plant generated 11,179,485 pounds of kickback in 1984.  Corwin
opined that the figure should have been approximately 11,000 pounds.  Corwin
also opined that it was not plausible that contaminated ballast was fed into
the boiler through pneumatic lines because the rocks would tear up the system.

          Welch testified that the ballast under the
tram track was never removed but that the screening around the track was
“occasionally scraped”—maybe once a year or less—to remove contaminated
material and was then shipped off.

          Barkley testified that only a “minute”
amount of kickback dripped from the treated product and trams onto the
screening.  He also opined that it was not possible to put ballast or screening
into a hog without destroying it; according to Barkley, the hog was for wood.

          Mendoza testified the contaminated ballast
and rock underneath the tram track was collected with a tractor “every so often,”
not every day, and filled into holes in the yard.

          And Urbanowsky testified that the amount of
kickback from the treated wood products that fell onto the area around the
track depended on “how good a vacuum they had pulled on” the product in the
cylinder.  He recounted that before the drip pad was installed, the trams had
compartments that caught kickback and that some of that material would “slosh[]”
out onto the ballast.  Urbanowsky opined that “a barrel or two, maybe, at the
most” would drip from the treated product or trams and onto the ground and that
the plant workers would either scoop it up (if there was enough of it) or cover
it with dirt.  He said that the contaminated ballast would be cleaned up “[i]f
you [had] a bad enough mess” and that he did not think that contaminated
ballast was collected on a daily basis.  Urbanowsky did not know how the plant
disposed of contaminated ballast, but he did not think it was possible for the
ballast to be thrown into a hog—and he had never seen or heard of that being
done before—because the rocks would “mess the hog up” and the “[s]uction may
not be strong enough to push it” up into the boiler.  He recalled that from
1992 to 1995, after the drip pad was installed, the kickback cleaned up from
the drip pad was put in barrels and “shipped out,” not burned in the boiler, as
Dr. Cheremisinoff’s figures reflect.

                                      (3)     Treated
Wood

          Dr. Cheremisinoff opined that from 1980 to
1989, hundreds of thousands of pounds of treated wood spacers were burned in
the plant’s boilers, contributing to the release of dioxins and PAHs into the
atmosphere.[30]  Donnie Faust testified
that he was responsible for driving a trash truck at the plant in the late
1970s and early 1980s and that, except for the early years, he transported four
tons of treated wood to the boiler every night to be burned.  Davis testified
that he fed treated wood into the Babcock-Wilcox boiler every night and sometimes
during the day and that treated wood was shipped to the plant from off-site to
be burned.[31]

          Contrary to Dr. Cheremisinoff’s, Donnie’s,
and Davis’s testimony, Corwin opined that, based on his calculations, no more
than one ton of treated wood was burned per day.[32]
 He also testified that the plant quit using wood spacers in 1985 or 1986 and
that Dr. Cheremisinoff’s figures were too high because they included
calculations for treated wood for the years 1987 and 1988.  Corwin’s figures
are consistent with a figure set out in a 1981 draft permit for the
installation of the Keeler boiler, which identified a “Wood Waste Production
Rate[]” at “1 ton/day maximum” of wood strips.  The document stated that
“[t]his waste is currently [landfilled],” but it indicated that “[i]n the
future[,] these kiln sticks will be chipped up and stored in a surge bin from
which they will be slowly metered into the boiler where they will be used as
fuel.”

          Stehly, who in 1982 was the director of
environmental quality for AT&SF, testified that he knew treated wood was being
burned to fuel the boiler; that the treated wood constituted a “relatively
small amount” of the total wood that was burned; and, significantly, that the
plant was allowed to burn treated wood because it had a permit issued by the
State to do so.[33]

          Mendoza agreed that treated wood or sawdust
was shipped to the plant and burned in the Babcock-Wilcox boiler, but he
recalled that a “very little amount” of treated wood was burned in the Keeler
boiler.  Similarly, Welch testified that treated wood spacers were buried and
that “very little” treated wood chips or sawdust was burned.  And Barkley
testified that the plant burned treated wood but that it “didn’t have that much
volume of it.”

                             b.       Incinerator

          Dr. Cheremisinoff opined that
BNSF was negligent because it did not use an incinerator to dispose of creosote-treated
wood waste.  According to Dr. Cheremisinoff, unlike the plant’s boiler, which was
designed to generate energy, an incinerator would have operated at temperatures
high enough to completely destroy the waste and any toxins.[34]
 He testified that the plant had considered installing an incinerator as early
as the 1970s and had even completed an application for a permit to install a
trench incinerator, but that the plant ultimately withdrew the application and
did not install an incinerator.

          Corwin, however, testified that a trench
incinerator would not have achieved complete combustion of creosote-treated
wood waste and that it would not have been appropriate to use at the plant.  He
opined that the Keeler boiler achieved complete combustion of wood products and
dioxins and that its level of combustion was greater than that of an
incinerator.

                             c.       Other
Disposals of Waste

          The
Fausts contend on appeal that BNSF was negligent because it disposed of sap
water in several unlined lagoons or pits to evaporate over time and spread
cylinder drainage and kickback about the property to control dust.[35]
 But unlike with fly ash, bottom ash, vapor emissions, and fugitive emissions, Dr.
Cheremisinoff did not include naturally evaporating sap water or waste spread
for dust control as “emission sources” in his emissions calculations.[36] 
And like the evidence pertinent to the amount of creosote-treated waste produced
and burned in the boiler, the evidence regarding the spreading of creosote
mixture for dust control was conflicting.[37]

                   2.       Air Emissions,
Pollution Control, and Air Monitoring

          Dr.
Cheremisinoff opined that BNSF negligently operated the plant because it
emitted significant quantities of dioxins and PAHs into the atmosphere.  He calculated
the levels of toxins in the fly ash and bottom ash emitted from incompletely combusting
creosote-treated wood waste in the boilers, in the emissions from unloading and
charging cylinders, and in the fugitive emissions from treated wood ties on the
drip pad.

          Dr. Cheremisinoff also opined that BNSF was
negligent because it did not use a pollution control device on its boilers,
which would have captured dioxins and PAHs “as particulate forms.”  He
testified that various types of pollution control devices, including dry
scrubbers, wet scrubbers, countercurrent scrubbers, rotary kilns, afterburners,
and cyclones, had been available for commercial use for years.

          Dr. Cheremisinoff further opined that BNSF
was negligent because it did not perform any air monitoring of the boilers’ emissions,
which would have informed BNSF of the quality of the emissions from the boilers’
stacks, and did not perform any air models, which would have informed BNSF of
Somerville’s exposure to the plant’s emissions.  He reasoned that BNSF could
have used opacity sensors on its boilers, performed stack testing, or had a
certified stack test performed.

          Contrary to Dr. Cheremisinoff’s testimony,
Corwin testified that Dr. Cheremisinoff’s ash numbers were high and, thus,
incorrect because they were off by a factor of ten.[38] 
He also opined that Dr. Cheremisinoff’s overall dioxin and PAH emission figures
were high because they were based on amounts of waste that were not fed into
the boiler, as addressed in detail above, and because the boiler had a higher
combustion efficiency than what was calculated—the boiler completely combusted
dioxins and PAHs.  Corwin further opined that it was obvious that the Keeler
boiler had a multiclone on it (the original permit showed a model number and
specifications for a multiclone) and that the multiclone—though not truly a
“pollution control device” as it was used on the Keeler boiler—operated to
enhance the combustion process of the unit, thus ensuring “that you’re burning
out the carbon to get all the energy from it to have very little emissions on
organics.”[39]  Corwin testified that
black smoke emitted from the boilers’ stacks as a result of “upset conditions”
and was part of the combustion process.  And as Dr. Cheremisinoff agreed, the
plant had never been cited for any air permit violations.

          Stehly testified that the plant never performed
any air models because there was no indication that the plant’s emissions were
harming anyone.  Stehly’s testimony is supported by the evidence demonstrating
that the plant burned significantly less creosote-treated waste than that
calculated by Dr. Cheremisinoff and either buried or burned other amounts of
waste.

                   3.       Employee Safety and
Information

          Dr.
Cheremisinoff opined that BNSF was negligent because it did not inform its
employees of the dangers associated with working around the chemicals used at
the plant or provide them with protective clothing and equipment when they
worked around the chemicals, as recommended by numerous material safety data
sheets (MSDS) and several NIOSH studies.[40]  Dr. Cheremisinoff testified
that without using appropriate protective equipment, chemicals could soak
through clothes and contact the body or be taken home and be exposed to others,
and he saw no evidence that BNSF informed the Fausts about the chemicals that
they were exposed to.

          Donnie testified that when he cleaned the
cylinders, he was never given a respirator, rubber gloves, or an apron; instead,
the plant provided him with only a hard hat and safety glasses.  He also said
that no one explained to him what was in creosote and that he did not learn of
an MSDS until Koppers took over.

          Likewise, Davis testified that the plant
never told him to avoid contact with creosote,[41] that he was not given
rubber gloves until the late 1990s, and that he did not know what an MSDS was
before 1995.  Urbanowsky testified that he was not told that the chemicals he
worked with were hazardous or that he should wear gloves or other protective
equipment.

          Welch, on the other hand, testified that the
plant had safety meetings; that MSDSs were explained to employees, were on
file, and were available for viewing; that industrial hygienists gave
presentations to employees; and that employees were furnished with protective
gloves, coveralls, and, depending on the position, respirators and possibly
face shields.

          Similarly, Barkley testified that protective
equipment, including gloves, boots, respirators, and aprons, were provided to
employees; that MSDSs were available for employees to view; and that he
attended safety committee meetings once a month.  Barkley also authored a
document entitled “Procedures For Use of Respirators,” which stated in part
that “[q]ualified personnel will instruct persons required to use respirators
as to the proper respirator and its correct application” and that “[i]ndividuals
entering treating cylinders for inspection or cleaning will wear an approved
air supplied respirator.”

          And Malter testified that the plant had a
“formal hazard communication program” and communicated with employees about
MSDSs and potential chemical hazards.  When he visited the plant in 1981,
employees used PVC rain suits and respirators when cleaning cylinders, and the
plant made skin creams available to employees though the industrial hygiene
program.

          Finally, we note that while Dr.
Cheremisinoff opined that employees wearing creosote-contaminated clothing
could have exposed others in their homes to creosote, Dr. Rosenfeld, the
Fausts’ dose expert, unequivocally testified that he did not calculate a daily dose
for Linda’s take-home exposure from Donnie’s possibly contaminated clothing.

                   4.       Factual Sufficiency
Conclusion

          In
the face of conflicting evidence, including conflicting expert testimony, we
may not substitute our own judgment for that of the jury’s.  See, e.g., Quiroz
ex rel. Quiroz v. Covenant Health Sys., 234 S.W.3d 74, 84–85 (Tex. App.—El
Paso 2007, pet. denied) (holding evidence factually sufficient to support
jury’s failure to find defendants negligent).  Having considered and weighed all of the evidence in the
record pertinent to the jury’s refusal to find that BNSF was negligent, the
evidence supporting the finding is not so weak, or so contrary to the
overwhelming weight of all the evidence, that the answer should be set aside.  See
Pool, 715 S.W.2d at 635; Garza, 395 S.W.2d at 823; King’s
Estate, 150 Tex. at 664, 244 S.W.2d at 661.  Accordingly, we hold that the
evidence is factually sufficient to support the jury’s refusal to find that
BNSF was negligent.[42]  We overrule the Fausts’
second issue.

V.  Conclusion

          Having overruled the Fausts’
two issues, we affirm the trial court’s judgment.

 

 

 

BILL MEIER
JUSTICE

 

PANEL:  WALKER, MCCOY, and
MEIER, JJ.

 

DELIVERED:  January 27, 2011









[1]Linda successfully treated
the H. pylori before undergoing the surgery to remove her stomach.





[2]BNSF sold the plant to
Koppers, Inc. in 1995.  Koppers currently operates the plant.





[3]The creosote used at the
plant—a black, oily material—was derived from coal tar.  The International
Agency for Research on Cancer (IARC) classifies creosote as probably
carcinogenic to humans.





[4]One of the Fausts’ experts
testified that the plant also treated wood products with pentachlorophenol
(PCP), a now-banned pesticide, and copper chromium arsenate (CCA), another
pesticide.  The expert agreed, however, that the plant had not used PCP and CCA
since 1981.





[5]The primary solvent that
the plant used to accelerate the wood-drying process was naptha.





[6]In 1992, the plant built a
“drip pad”—a concrete pad with an underlying reservoir—to help collect kickback
from the treated wood products.  Before 1992, the kickback dripped onto the
soil or ballast.





          [7]Dioxin
is a byproduct of incomplete combustion of a source containing chlorine.  The
IARC classifies dioxin as carcinogenic to humans.

 





[8]PAHs are a byproduct of
incomplete combustion of organic materials.  According to one of BNSF’s experts,
PAHs are found “all over the place.  Everywhere.”  But the IARC classifies
benzo[a]pyrene, a PAH, as probably carcinogenic to humans.





[9]From the late 1930s to the
early to mid 1980s, the “Babcock-Wilcox” boiler supplied steam energy for the
treating process.  The “Keeler” boiler came online to replace the
Babcock-Wilcox boiler in the mid 1980s.  Both boilers were biomass, or
wood-fired, boilers.





[10]The trial court also
instructed the jury that “[t]he only substances whose exposure you are to
consider are PAHs and dioxin; you are not to consider any exposure to other
chemicals, including chromium (VI), arsenic, CCA, or PCP.”





[11]See generally Lakie v.
SmithKline Beecham, 965 F. Supp. 49, 55 (D.D.C. 1997) (stating that the
“defendant confuses, at times ignores, the crucial distinction between the admissibility
of expert scientific testimony and the weight such testimony should be
afforded by the trier of fact”) (emphasis in original).





[12]When determining whether
expert testimony constitutes some evidence, i.e., is legally sufficient, the
appellate court must look beyond the expert’s bare conclusions and make a
threshold determination whether the expert’s opinion is scientifically
reliable.  Havner v. Merrell Dow Pharm., Inc., 953 S.W.2d 706,
711–14 (Tex. 1997).  The appellate court performs this sufficiency review
because if the expert’s testimony is not scientifically reliable, it is,
legally, no evidence and, thus, cannot survive a legal sufficiency review.  Id.
at 714.





[13]Dr. Dahlgren relied on
epidemiological studies to support his causation opinion.

 





[14]See, e.g.,
Mendes-Silva v. United States, 980 F.2d 1482, 1487 (D.C. Cir. 1993) (“Dr.
Bulle gave specific testimony on his basis for ruling out viral causes and
other explanations for the encephalomyelitis, and Dr. Lane suggested in
response that alternative explanations for Ms. Mendes-Silva’s illness
nonetheless remained.  The evaluation of these competing explanations presents
‘a classic battle of the experts, a battle in which the [factfinder] must decide
the victor.’”).





[15]The Fausts do not argue
that the instruction was improper because it identified only part of specific
causation.





[16]When objecting to the
instruction, the Fausts’ attorney said, “It can be argued in the proximate
cause section that’s addressed in Question Number 1, I believe.”





[17]This means that the risk
of an injury or condition in the exposed population is more than double the
risk in the unexposed or control population.  Havner, 953 S.W.2d at 717–18.





[18]This means that if the
study was repeated numerous times, the confidence interval would indicate the
range of relative risk values that would result 95% of the time.  Havner,
953 S.W.2d at 723–24.





[19]The Havner court
cautioned that “[o]ther factors must be considered” because epidemiological
studies show only an association.  Havner, 953 S.W.2d at 718.





[20]The Robinson
factors include:  (1) the extent to which the theory has been or
can be tested, (2) the extent to which the technique relies upon the
subjective interpretation of the expert, (3) whether the theory has been
subjected to peer review and publication, (4) the technique’s potential
rate of error, (5) whether the underlying theory or technique has been
generally accepted as valid by the relevant scientific community, and
(6) the nonjudicial uses that have been made of the theory or technique.  Robinson,
923 S.W.2d at 557.  The Bradford Hill criteria include:  (1) the
strength of association, (2) consistency of association,
(3) specificity of association, (4) temporality, (5) biological
gradient or dose-response relationship, (6) plausibility,
(7) coherence, (8) experimental evidence, and (9) analogy.  Havner,
953 S.W.2d at 718 n.2.; Torres, 198 S.W.3d at 804 n.4.





[21]Jury
question 1 defined “Negligence” as the “failure to use ordinary care, that is,
failing to do that which a person of ordinary prudence would have done under
the same or similar circumstances or doing that which a person of ordinary
prudence would not have done under the same or similar circumstances.”  See
IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason, 143 S.W.3d
794, 798 (Tex. 2004) (identifying elements of negligence cause of action as the
existence of a legal duty, a breach of that duty, and damages proximately
caused by the breach).





[22]In forming his opinions,
Dr. Cheremisinoff reviewed internal memoranda and correspondence between BNSF,
the State, vendors, and chemical suppliers; reviewed the plant’s operating
procedures; reviewed the boiler operations; reviewed remedial investigation
reports; reviewed depositions and other experts’ reports; reviewed relevant
scientific literature; interviewed a number of former plant employees; and
visited the plant twice.





[23]Dr. Cheremisinoff’s drum
figures are based on a fifty-five gallon capacity drum (or barrel).





[24]Dr. Cheremisinoff
testified on cross-examination that 3.5 tons of cylinder drainage equaled
roughly “six plus drums.”  However, he also testified that the same amount
equaled “[f]our drums.”





[25]A 1982 letter to the
Texas Department of Water Resources stated that “cylinder sludge” consisting of
wood chips, sawdust, and dirt contaminated with treating mixture is removed
from the treating cylinders “once every sixteen months, at which time it is handled
off-site for disposal.”  [Emphasis added.]  Dr. Cheremisinoff agreed during
cross-examination that the cylinders are cleaned every sixteen months.





[26]For example, based on the
1984 figures, Dr. Cheremisinoff opined that twenty drums of contaminated
ballast (containing sand and moisture) were fed into the boilers every day.





[27]Dr. Cheremisinoff
referenced a 1994 Pollution Prevention Plan prepared by Radian Corporation that
stated “[a]bout 80 tons of waste [is] typically generated each year from
cleanup of creosote drips along tracks.”





[28]Dr. Cheremisinoff opined
that a hog is “basically a chipper.  You . . . use this to shave,
chop up wood chips into smaller particles.”





[29]He was not sure if a hog
was used as part of this process in the 1980s.





[30]Dr. Cheremisinoff also
opined that the plant was negligent because treated material was shipped to the
plant from several other locations.





[31]Urbanowsky testified that
treated sawdust from cutting treated wood at the sawmill was fed into the
boiler, too, but his testimony about the quantity of treated sawdust fed into
the boiler was vague.





[32]Corwin testified:

[BNSF counsel]:  All right.  Now, the -- on the treated
wood poundage right here, is -- you feel that this -- Based on your
understanding of what went on at the Somerville tie plant, do you think [Dr.
Cheremisinoff’s] treated wood calculations are appropriate or correct?

[Corwin]:  They’re not quite correct.

[BNSF counsel]:  Why not?

[Corwin]:  Well, the one number, if you take a look at
1981, the 730,000 is based on a 1 ton per day number.  And then he took that
number and ratioed the total volume production for the rest of the time to that
number.  He should have taken the 1 ton per day, calculated what the total mass
volume flow rate -- or total volume is that would be associated with that and
then ratio it down.

[BNSF counsel]:  Did Dr. Cheremisinoff take into
consideration the burying of any of the strips at all?

[Corwin]:  No, he did not.





[33]Dr. Cheremisinoff agreed
that the plant had a 1981 permit that allowed it to burn one ton of treated
wood per day and a 1994 permit that allowed it to burn four barrels of treated
wood per month.





[34]Dr. Cheremisinoff opined
that the waste fed into the boilers was not burned for a long enough period of
time or at a high enough temperature to destroy dioxins and PAHs.





[35]Davis and Mendoza also
recalled a procedure referred to as a “Santa Fe flush,” in which
wastewater was flushed into a ditch located on the plant’s property when there
was a heavy rainstorm.





[36]Indeed, Gale Hoffnagle
testified for BNSF that the sources of PAHs at the plant include “the boiler
stacks and then the process itself, including opening of the treatment
cylinder, the vents from the process . . . [,] the storage tanks for
creosote, and the wood that’s laying out in the -- in the yard.  They all emit
some PAHs.”





[37]Welch recalled that
reclaimed diesel and water were used to address dust.





[38]Corwin testified that
burning wood typically produces only .5% ash, not 5% ash as Dr. Cheremisinoff
calculated.





[39]Dr. Cheremisinoff seemed
to concede on cross-examination that he was wrong about the Keeler boiler not
having a multiclone on it.





[40]For example, several
MSDSs recommended using rubber/neoprene gloves, overalls or an apron, and a
face shield to protect against clothing contamination and skin contact from
creosote.  The 1980 NIOSH report recommended that employees who came into
contact with creosote wear appropriate clothing and shower before leaving the
plant, if necessary.  The 1977 NIOSH report similarly recommended that
protective clothing be worn.  Dr. Cheremisinoff also testified about a 1980
letter drafted by David Malter in which Malter recommended, among other things,
that protective clothing be provided to employees who have the potential for
contact with creosote and that a general meeting be held to advise the
employees of the meaning of the NIOSH results.





[41]In fact, Davis recalled
being told that creosote was not harmful.





[42]We therefore do not
address the sufficiency of the evidence to support the jury’s refusal to find
that BNSF’s negligence, if any, proximately caused Linda’s stomach cancer.  See
Tex. R. App. P. 47.4; Hutchison, 158 S.W.3d at 562; Carr, 884
S.W.2d at 802–03.